UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,               Cr. No. 92-81058

v.                                Honorable Matthew F. Leitman

D-21 RONALD HUNTER,

        Defendant.

_____/

## SUPPLEMENTAL BRIEF IN SUPPORT OF RONALD HUNTER'S PRO SE MOTION FOR COMPASSIONATE RELEASE (ECF No. 952)

Ronald Hunter, through counsel, submits this supplemental brief in support of his pro se motion seeking a reduction of his sentence to time served under Section 603 of the First Step Act of 2018 ("1SA"), Pub. L. 115-319, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)(i)).[1] (*See* ECF No. 952, Pro Se Mot.)

Mr. Hunter is serving a life sentence after a jury convicted him of a killing in furtherance of a continuing criminal enterprise ("CCE") and a related gun charge that occurred when he was just 23 years old. The CCE charge carried a 20-year mandatory

---

[1] Two 1SA provisions offer relief to Mr. Hunter. Section 404 authorizes retroactive application of the Fair Sentencing Act., and Mr. Hunter previously filed § 404 motions, which remain pending. (*See* ECF Nos. 944, 950.) This brief supplements his request for relief under Section 603, which governs compassionate release. The motions are based on different considerations and historical approaches to clemency but they share a bottom line: Mr. Hunter is being over-punished, possibly fatally, and, for the first time in decades, the Court has the authority to correct that.

minimum, 21 U.S.C. 848(e)(1)(A), and the gun charge carried a mandatory five-year consecutive sentence, 18 U.S.C. § 924(c). Judge Taylor sentenced him to life in prison under the then-mandatory Sentencing Guidelines.

A lot has changed since Mr. Hunter's 1997 convictions: the law, our understanding of youth, and Mr. Hunter himself. Thanks to the 1SA, this Court has authority to take a second look at Mr. Hunter. Today, he is a remorseful 51-year-old man who has languished in prison for nearly a quarter of a century. Mr. Hunter has been in federal custody for 23 years, 7 months, and 10 days (283 months and 10 days).[2] With good time credit, he has served the rough equivalent of 28 years (336 months).

While in custody, Mr. Hunter has participated in programming, maintained relationships with his family and friends, striven to continue his growth and development through self-study programs and self-help books about how to be a better man, and obtained his GED. At the same time, Mr. Hunter's health conditions, including morbid obesity and poorly-controlled hypertension, have worsened, rendering him particularly vulnerable to COVID-19.

Several circumstances establish extraordinary and compelling reasons for Mr. Hunter's release: (1) his continued incarceration during a global pandemic presents

---

[2] Although his PSR reports a detention date in May 1997, (PSR at 1), the BOP's sentence computation begins in July 1999, more than two years later, (*see* Ex. 1, Pub. Info. at 3). Mr. Hunter was arrested by federal authorities on November 20, 1996, and has been in federal or state custody since that time. When his state time is accounted for, he has been in custody for 24 years, 1 month, and 18 days.

grave risks to his health; (2) his youth at the time of the conduct underlying his convictions coupled with the mandatory nature of the Guidelines at sentencing; (3) sentencing disparities between him and his more culpable co-defendants, almost all of whom are now free; and (4) his demonstrated rehabilitation.

## BACKGROUND

### I.    Personal

Mr. Hunter was born in Detroit in January 1969, a year-and-a-half after the long, hot summer of 1967, to 14-year-old Francis Hunter. (PSR ¶ 64.) He was raised by a maternal great aunt from infancy. (*Id.*) He had limited contact with his mom and never met his dad. (PSR ¶ 64.) While his aunt provided for his basic needs, she was forced to take him in, and Mr. Hunter never received the love and support children so desperately need. (*See* Ex. 2, Hunter Ltr.) As he reached adolescence, he began "to look for love and acceptance in unhealthy arenas[.]" (*Id.*) He started smoking weed at 13, dropped out of school in ninth grade, and was drinking alcohol daily by the time he reached 16. (PSR ¶¶ 68-69.) Trouble ensued. At 19, Mr. Hunter was convicted of a drug offense in state court. (*Id.* ¶ 48.) Not long after he was released on parole, he absconded, violated, and escaped from custody. By 27, he had more state convictions. (*Id.* ¶¶ 50-53.)

### II.    Procedural

The government indicted Mr. Hunter with ten codefendants in the late 1990s. (ECF No. 275.) Count 1 charged a drug trafficking conspiracy. Counts 4, 6, 8, and 10 charged Mr. Hunter with intentional killing in furtherance of or while engaging in a

CCE, aiding and abetting, 21 U.S.C. § 848(e)(1)(A) and 21 U.S.C. § 2. Counts 5, 7, 9, and 11 charged him with use or carrying of a firearm, 18 U.S.C. § 924(c).

This indictment stemmed from a case the government initiated in 1992 that grew into a multi-defendant prosecution against 22 people involved in a violent drug trafficking organization headed by Timothy Patton and Roderick Crawford. (PSR ¶ 20.) The Patton-Crawford organization was responsible for flooding the streets of Detroit with thousands of kilograms of cocaine and crack. (*Id.* ¶¶ 14, 17-18.) Patton, along with others, ordered the killings of multiple people – including Ms. Monica Johnson, who Mr. Hunter was eventually convicted of killing. (*Id.* ¶¶ 20-22, 28.[3]) Patton wanted Ms. Johnson dead because she stole "over a million dollars in drug proceeds belonging to the drug organization[.]"[4] (*Id.* ¶ 20.)

Despite being responsible for multiple deaths and for fueling the crack epidemic in Detroit that no doubt claimed additional lives, Patton and Crawford cooperated, received favorable pleas, and escaped any responsibility for the murders. (*Id.* ¶ 16; ECF No. 828, PageID.745-747.) Patton was released from prison in March 2004 and

---

[3] To the extent the PSR suggests Mr. Hunter was involved in other killings, this is inaccurate. He was convicted of one murder and acquitted on the others.

[4] Before Ms. Johnson's death, Patton and others kidnapped her in an attempt to recover the money. (PSR ¶ 10.) When this failed, Patton ordered her dead. The first attempt on her life occurred in March 1992. (*Id.* ¶ 20.) Instead of killing her, David Powell and Edwin Culp killed "three innocent victims" who were not involved in the conspiracy. (*Id.*) Powell pled guilty to these killings and a jury found Culp guilty.

Crawford in 2005. David Powell pled guilty to killing three people, *see* note 4, and a related § 924(c). He was released from BOP custody in 2013.

Unlike his co-defendants, who, as leaders of the organization had more to offer the government, Mr. Hunter exercised his constitutional right to a jury trial. A jury found him guilty of the December 1992 killing of Monica Johnson and of using a gun to commit that crime (Counts 4 and 5) and not guilty of all other charges. Mr. Hunter was sentenced to life in prison under the then-mandatory Guidelines regime.

Mr. Hunter was 23 years old at the time of the killing. He has been in custody since age 27 and will be 52 by the time briefing is completed.

## LEGAL STANDARD

Compassionate release is appropriate when: (1) "extraordinary and compelling reasons warrant" a reduction; and (2) the reduction is consistent with the 18 U.S.C. § 3553(a) factors, "to the extent that they are applicable[.]" 18 U.S.C. § 3582(c)(1)(A). "Until the Sentencing Commission updates § 1B1.13 . . . , district courts have full discretion . . . to determine whether an 'extraordinary and compelling' reason justifies a compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." *United States v. Jones*, 980 F.3d 1098, 1108 (6th Cir. 2020).

## ARGUMENT

### I.    Mr. Hunter Has Exhausted Administrative Remedies.

Mr. Hunter's request for compassionate release from the BOP was denied by FCI Pekin's warden on October 13, 2020. (*See* Ex. 3, Denial (SEALED).) Because there

has been a "lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," there is no barrier to relief. 18 U.S.C. § 3582(c)(1)(A)(i).

## II.    Extraordinary and Compelling Reasons Warrant Mr. Hunter's Release.

This Court has discretion to "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). In addition to health reasons, courts have found a variety of circumstances "extraordinary and compelling": the defendant's age at the time of the crime,[5] mandatory guidelines,[6] overly long sentences,[7] and extraordinary rehabilitation.[8]

### A.    Mr. Hunter's Health Conditions and Confinement during the COVID-19 Pandemic Are Extraordinary and Compelling Reasons.

COVID-19 is a dangerous disease and the pandemic it gave rise to is a public health crisis unprecedented in modern times. A person's likelihood of succumbing to COVID depends on: (1) their health and demographics and (2) where they live.

---

[5] *See, e.g.*, *United States v. Maumau*, No. 08-cr-00758, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020) (reducing sentence based on age at the time of unlawful conduct, the length of the imposed sentence imposed, subsequent change in law, and rehabilitation).
[6] *See, e.g.*, *United States v. Jones*, No. 94-cr-20079, 2020 WL 5359636, at *7 (N.D. Cal. Aug. 27, 2020) (reducing sentence based in part on *Booker*'s change to advisory guidelines); *United States v. Quinn*, 467 F. Supp. 3d 824, 827-28 (N.D. Cal. 2020) (same).
[7] *See, e.g.*, *United States v. Price*, No. 07-cr-0152, 2020 WL 5909789, at *4-6 (D.D.C. Oct. 6, 2020) (releasing defendant sentenced to a mandatory life sentence); *United States v. Day*, -- F. Supp. 3d --, 2020 WL 4251803, at *12 (E.D. Va. July 23, 2020) (extraordinary and compelling reasons where defendant's sentence today would be dramatically different); *United States v. Cantu-Rivera*, No. 89-cr-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019).
[8] *See, e.g.*, *United States v. Stephenson*, 461 F. Supp. 3d 864, 872-73 (S.D. Iowa 2020).

1.      **Mr. Hunter's Preexisting Conditions Make Him More Susceptible to the Scourge of COVID.**

As a 51-year old morbidly-obese Black man with a history of smoking, hypertension, hyperlipidemia, and sleep apnea, Mr. Hunter is particularly vulnerable. The combination of his conditions has a compounding effect that places him in extremely serious danger, especially in light of his age.[9]

*Morbid Obesity.* Mr. Hunter is morbidly obese. In March of 2020, Mr. Hunter weighed 346 pounds. (*See* Ex. 4, 2020 BOP Med. R. at 17, 18, 34 (SEALED).) He has lost weight since then and estimates he now weighs 334 pounds. At 5'10", Mr. Hunter's body mass index ("BMI") is 47.9, well over the morbid obesity threshold of 40.[10]

The CDC has labeled obesity as a risk factor with the "strongest and most consistent evidence" for an association with severe illness from COVID-19.[11] People with BMIs of 40 or more are 4.5 times more likely to be hospitalized than persons with healthy BMIs regardless of age.[12] People under 60, like Mr. Hunter, with BMIs over 35, are 3.6 times as likely to need acute medical care related to COVID-19 than those with BMIs under 30.[13] Further, morbidly-obese racial minorities "are at even

---

[9] CDC, *Older Adults* ("Risk for severe illness with COVID-19 increases with age, with older adults at highest risk.").

[10] Of additional concern is that at least twice over the past two years, Mr. Hunter's A1C levels have been elevated to the point he was considered prediabetic. (Ex. 4, 2020 BOP Med. R. at 17; Ex. 5, 2019 BOP Med. R. at 5 (SEALED).)

[11] *See* CDC, Medical Conditions Evidence Table.

[12] *See* CDC, *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*.

[13] *See* Jennifer Lighter, et al., *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID- 19 Hospital Admission*, Clinical Infectious Diseases (2020).

7

higher risk for severe COVID-19 illness."[14] Thus, courts nationwide, including this one, conclude that obesity, either alone or in combination with other preexisting conditions, satisfies the "extraordinary and compelling" standard.[15]

*Former Smoker.* Before his arrest, Mr. Hunter regularly smoked marijuana wrapped in cigars. "Being a current or former cigarette smoker increases your risk of severe illness from COVID-19."[16] Because COVID-19 "is a respiratory disease," and smoking affects lung function, this history puts Mr. Hunter at higher risk from the disease.[17] Due to this correlation, courts, including at least two in this district, have granted compassionate release to individuals with histories of smoking.[18]

*Hypertension.* Mr. Hunter is at increased risk of severe or fatal complications from COVID-19 due to hypertension, a condition for which he takes four medications daily: potassium chloride, lisinopril, amlodipine, and furosemide. (*See, e.g.*, Ex. 4, 2020 BOP Med. R. at 9, 12-13, 17.) His blood pressure readings in 2020 and 2019 were:

| Date | Value | Category | Record Citation |
|------|-------|----------|-----------------|
| 8/17/2020 | 207/85<br>166/90 | Hypertensive crisis<br>Stage 2 hypertension | Ex. 4, 2020 BOP Med. R. at 9 |
| 3/2/2020 | 163/87 | Stage 2 hypertension | Ex. 4, 2020 BOP Med. R. at 17 |

---

[14] *See* CDC, *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*.

[15] *See, e.g.*, *United States v. King*, No. 17-cr-20332, 2020 WL 5440324, at *2 (E.D. Mich. Sept. 10, 2020) (granting release to man with BMI of 35.2 who also suffered from asthma); *United States v. Mitchell*, No. 17-cr-20263, ECF No. 94 (E.D. Mich. Aug. 18, 2020) (releasing a 24-year-old woman whose sole condition was a BMI of 31-32).

[16] CDC, *People with Certain Medical Conditions*.

[17] *United States v. Galaz*, 2020 WL 4569125, at *4 (S.D. Cal. Aug. 7, 2020) (citing studies).

[18] *See United States v. Brady*, No. 18-cr-20106, 2020 WL 7053811, at *1 (E.D. Mich. Dec. 2, 2020); *United States v. Andrade*, No. 16-cr-20751, 2020 WL 5505344, at *2 (E.D. Mich. Sept. 11, 2020).

| 10/2/2019 | 144/94 | Stage 2 hypertension | Ex. 5, 2019 BOP Med. R. at 25 |
| | 170/90 | Stage 2 hypertension | |
| 8/15/2019 | 125/74 | Elevated blood pressure | Ex. 5, 2019 BOP Med. R. at 25 |
| 6/5/2019 | 138/83 | Stage 1 hypertension | Ex. 5, 2019 BOP Med. R. at 25 |
| 5/21/2019 | 186/92 | Hypertensive crisis | Ex. 5, 2019 BOP Med. R. at 25 |
| 5/8/2019 | 179/91 | Stage 2 hypertension | Ex. 5, 2019 BOP Med. R. at 25 |
| 4/30/2019 | 210/106 | Hypertensive crisis | Ex. 5, 2019 BOP Med. R. at 25 |
| | 206/110 | Hypertensive crisis | |

All of the 2020 blood pressure readings are indicative of either stage 2 hypertension or hypertensive crisis. (*See* Ex. 6, Am. Heart Ass'n Hypertension Chart.) Despite finding his blood pressure high enough in August 2020 to warrant weekly readings for 30 days, the records contain no additional readings. (Ex. 4, 2020 BOP Med. R. at 8.)

The CDC warns that hypertension increases the risk of hospitalization from COVID-19 three-fold.[19] High blood pressure also is the most common comorbidity for COVID deaths.[20] Several courts in this district thus have identified hypertension as increasing the risk of a severe COVID infection.[21] Other courts agree.[22]

***Hyperlipidemia.*** Mr. Hunter has hyperlipidemia for which he takes Atorvastatin daily. (*See* Ex. 4, 2020 BOP Med. R. at 12.)  While high cholesterol is not

---

[19] *See* CDC, *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*.

[20] *See* N.Y. Tracker (hypertension is present in nearly 53% of COVID deaths).

[21] *See, e.g.*, *United States v. Watkins*, No. 14-20034 (E.D. Mich. Dec. 10, 2020); *United States v. Moore*, No. 12-cr-20733 (E.D. Mich. Nov. 24, 2020); *United States v. Jones*, No. 93-cr-81138 (E.D. Mich. Oct. 19, 2020); *United States v. Dixon*, No. 17-cr-20625 (E.D. Mich. Sept. 9, 2020); *United States v. Massingille*, No. 16-cr-20193, 2020 WL 4569562, at *3 (E.D. Mich. Aug. 7, 2020); *United States v. Goins*, No. 11-cr-20376, 2020 WL 3064452, at *5 (E.D. Mich. June 9, 2020).

[22] *See, e.g.*, *United States v. Robinson*, No. 10-cr-261, 2020 WL 4041436, at *5 (E.D. Va. July 17, 2020) (hypertension alone can cause a high risk of serious illness).

a specific risk factor for COVID-19 enumerated by the CDC, medical sources report increased risk of poor outcomes because of the negative effect high cholesterol has on the heart's functioning.[23] Independent of the impact on cardiac health, some of this research, including a study by the Scripps Research Institution, suggests that high cholesterol can trigger an aggressive immune response, or cytokine storm, in COVID-19 patients with hyperlipidemia.[24] This process can lead to more negative outcomes from COVID-19.[25] Moreover, statistics from New York public health authorities, which keep detailed records of comorbidities, reveal that hyperlipidemia is the third leading comorbidity in COVID-19 deaths, behind only hypertension and diabetes.[26]

Courts have correctly held that hyperlipidemia, combined with other conditions such as hypertension, can establish "extraordinary and compelling reasons" to support compassionate release in light of COVID-19.[27]

*Sleep Apnea.* In 2019, Mr. Hunter was evaluated for sleep apnea after complaining of "daytime drowsiness, snoring at night" and reporting that "Others say he stops breathing." (Ex. 5, 2019 BOP Med. R. at 2.) A sleep study found a "[s]uspected

---

[23] *See, e.g.,* David Templeton, *Cholesterol Could Be The Culprit in COVID-19 Deaths,* Pittsburgh Post-Gazette (June 7, 2020).

[24] *Id.*

[25] *Id.*

[26] *See* N.Y. Tracker.

[27] *See, e.g., United States v. Johnson,* No. 18-cr-20073, 2020 WL 5630008, at *3 (E.D. Mich. Sept. 21, 2020) (hyperlipidemia, in combination with other conditions, increases the risk of a severe COVID infection); *United States v. Pena,* No. 15-cr-551, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (releasing man with hypertension and hyperlipidemia).

pathological breathing disorder." (Ex. 4, 2020 BOP Med. R. at 63.) However, the BOP

decided otherwise and declined to provide him with a C-Pap machine. (Ex. 5, 2019

BOP Med. R. at 1.)

A French study found that obstructive sleep apnea raised the risk of early death

in COVID-19 patients. And courts have concluded that sleep apnea is a respiratory

problem that "can only predict an adverse reaction to COVID-19."[28] In fact, "[c]ourts

have granted compassionate release to incarcerated individuals with obesity and sleep

apnea because those conditions place them at high risk for serious complications due

to COVID-19."[29] This Court should do the same.

### 2.  COVID-19 poses acute risks to individuals in custody.

The COVID-19 pandemic is devastating the BOP. Already "tinderboxes for

infectious disease," prisons are even more dangerous now than we typically accept.[30]

As of January 5, 2020, more than 42,000 people incarcerated in the BOP and 4,800 staff

have contracted the virus.[31] One hundred and ninety-six incarcerated people have

---

[28] *United States v. Readus*, No. 16-cr-20827, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) (citation omitted); *United States v. Dean*, No. 11-cr-20195, 2020 WL 4251344, at *2 (E.D. Mich. July 24, 2020).

[29] *United States v. Delgado*, No. 18-cr-17, 2020 WL 2464685, at *4 (D. Conn. Apr. 30, 2020) (collecting cases); *see also United States v. Rivera*, No. 13-cr-20775, 2020 WL 5105090, at *3 (E.D. Mich. Aug. 31, 2020) (granting release to morbidly obese man with hypertension and sleep apnea and collecting cases).

[30] *United States v. Rodriguez*, 451 F. Supp. 3d 392, 394 (E.D. Pa. 2020).

[31] Over 1,160 inmate cases occurred in privately-run BOP prisons, a figure buried in a separate link on the BOP's website. Private prisons do not report staff cases.

11

died,[32] including at least 25 who were awaiting decisions on their compassionate release requests. One hundred and thirty-seven facilities (including private prisons) and 66 RRCs have confirmed cases. The spread of the virus in the BOP is not under control. And the consequences are felt far beyond prison walls.

"COVID-19 case rates have been substantially higher and escalating much more rapidly in prisons than in the US population."[33] Moreover, "the adjusted death rate in the prison population was 3.0 times higher than would be expected if the age and sex distributions of the US and prison populations were equal."[34] Based on the BOP's data, the disease the incarcerated at a rate at least 4.45 times the general population ("at least" because without universal testing, we do not know the true rate of infections).

Incarcerated people cannot take appropriate hygienic and social-distancing measures to protect themselves.[35] As the BOP Director told to Congress, "[p]risons are not designed for social distancing. In fact, they are designed for just the opposite."[36]

---

[32] Fifteen deaths occurred in private prisons and four occurred on home confinement.

[33] Brendan Saloner, *COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA Internal Med. (July 8, 2020).

[34] *Id.*

[35] *See United States v. Tamasoa*, No. 15-cr-0124, 2020 WL 6700416, at *4 (E.D. Cal. Nov. 13, 2020) ("Courts have concluded . . . that the danger of COVID-19 to high-risk individuals who are imprisoned is likely much greater than to those who are free to take their own protective measures.") (cleaned up) (collecting cases).

[36] *Examining Best Practices for Incarceration and Detention During COVID-19: Hearing before the Committee on the Judiciary United States Senate*, June 2, 2020 (statement of Michael D. Carvajal, Director, BOP). *See also* BOP, *Correcting Myths and Misinformation About BOP and COVID-19*, at 3 (admitting facilities are incapable of implementing social distancing measures).

This is problematic given that indoor transmission can occur in places with poor ventilation (such as prisons) from distances up to twenty feet and after as few as five minutes.[37]

At FCI Pekin, where Mr. Hunter is currently confined, there are 131 active cases amongst incarcerated people and 9 cases amongst staff.[38] Media accounts confirm that many who test positive for COVID-19 in BOP receive virtually no care, and that staff have "ignored or minimized . . . COVID-19 symptoms, and mixed the sick and healthy together in haphazard quarantines."[39] Indeed, the Department of Justice Office of Inspector General recently found that "[m]aintaining a safe, secure, and humane prison system remains a challenge for DOJ and the BOP."[40]

Those in federal detention who have been spared by COVID-19 still suffer: during the pandemic medical care for chronic conditions has been delayed and, in many cases, withheld entirely. An OIG inspection of Metropolitan Detention Center (MDC) Brooklyn, found that "sick call requests dating to early July 2020 had not been scheduled

---

[37] *See* Victoria Kim, *Infected after 5 minutes, from 20 feet away: South Korea study shows coronavirus' spread indoors*, L.A. Times (Dec. 9, 2020).

[38] *See* Fed. Bureau of Prisons, *COVID-19 Cases* (last visited Jan. 6, 2021).

[39] Keri Blakiger & Keegan Hamilton, *"I Begged Them to Let Me Die": How Federal Prisons Became Coronavirus Death Traps* (June 18, 2020); *see also* Daniel Brown & Nkechi Taifa, *Congress must do more to protect people in prisons and jails and those re-entering the community*, Des Moines Register (Sept. 9, 2020).

[40] Michael E. Horowitz, Dep't of Justice, Office of Inspector General, *Top Management and Performance Challenges Facing the Department of Justice* 16 (Oct. 16, 2020).

or seen as of late September 2020."[41] At FMC Butner, a lawsuit alleges that when people do get sick with COVID-19, "treatment is almost nonexistent," and people are not transferred to a hospital until "they are already experiencing respiratory failure."[42]

> **B.   Mr. Hunter was an Emerging Adult at the Time of the Crimes, was Sentenced under a Guidelines Regime that has Since Been Held Unconstitutional, and Received a Disproportionately Harsh Sentence as Compared to His More Culpable Co-Defendants.**

The Supreme Court has acknowledged "what 'any parent knows'" and what research has shown time and time again: juveniles and young adults are different.[43] "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control."[44] Specifically, the prefrontal cortex of the brain does not reach "full adult maturity" until "the early to mid-20s," and this part of the brain controls impulse control, complex decision-making, inhibition, and planning. (Ex. 7, Keating Summ., at 3.) This is why young people have a difficult time adjusting risky behavior after they have begun. (*Id.* at 3-4.) The immature brain and hormonal balances

---

[41] Dep't of Justice, Office of the Inspector General, *DOJ Releases Report of Remote Inspection of Federal Bureau of Prisons Metropolitan Detention Center Brooklyn Examining the Institution's Response to the Coronavirus Pandemic* (Nov. 10, 2020).

[42] *Hallinan v. Scarantino*, No. 20-cv-00563, Compl. ¶¶ 78–79, available at https://www.aclu.org/legal-document/complaint-aclu-files-class-action-lawsuit-against-butner-fcc.

[43] *Miller v. Alabama*, 567 U.S. 460, 471 (2012).

[44] *Id.* at 471-72 (cleaned up).

lead young people "to focus more on the benefits of risky behavior than on the possible negative consequences of their actions." (*Id.* at 5.)

For these reasons, the Supreme Court acknowledged young people lack maturity and have "an undeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk taking."[45] They are also "more vulnerable to negative influences and outside pressures, including from their family and peers."[46] Critically, their characters are "not as well formed as an adult's" because their "traits are less fixed and [their] actions less likely to be evidence of irretrievable depravity."[47]

In short, although the law treated Mr. Hunter as an adult at the time of his offenses because he was 23, there is a compelling, evidence-based argument to change our approach to criminal conduct by emerging adults (ages 18-25).[48] Simply stated, unlike the law, neurologists resist an 18-year cutoff for good reason. The brain does not typically reach full maturity until age 25. (Ex. 7, Keating Summ., at 11-12.) Certainly, a person's cognitive development is stymied when they drop out of school in ninth grade, as Mr. Hunter did.

---

[45] *Id.* at 471 (cleaned up).
[46] *Id.* (cleaned up).
[47] *Id.* (cleaned up).
[48] *See generally* Elizabeth S. Scott et. al., *Young Adulthood As A Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016); Ex. 8, Arnett, Jeffrey Jensen, *Emerging Adulthood: A Theory of Development From the Late Teens Through the Twenties*, Am. Psychologist 469 (May 2000); *See* Ex. 9, Lindell, Karen U. & Goodjoint, Katrina L., *Rethinking Justice for Emerging Adults* 11-12 (2020).

Mr. Hunter was only 23 years old at the time of the homicide. At this age, he was susceptible to peer pressure and less than fully capable of regulating impulse control or risk-seeking behavior. Yet he is paying a bigger price for his actions than the more culpable men who received favorable deals from the government in exchange for their cooperation. *See* pages 4-5 & n.4, *supra.* This disparity and the fact of Mr. Hunter's youth at the time of his crimes are extraordinary and compelling circumstances.

Further, the fact that Mr. Hunter is serving a mandatory life sentence for an offense committed when he was 23 is an extraordinary and compelling reason. At the time of his sentencing, the Guidelines were mandatory, leaving the court without the power to ask whether the "within-Guidelines sentence [was] 'greater than necessary' to serve the objectives of sentencing."[49] Now that the Guidelines are advisory and judges are empowered to use their discretion to consider how someone's circumstances may call for imposing a sentence either above or below the guideline range, it is "proper for the Court to consider the fact that the Guidelines have changed – from mandatory to discretionary – in determining whether to grant compassionate release."[50] This is true even though *Booker* did not provide automatic relief to defendants like Mr. Hunter who were sentenced before the decision issued because he "was sentenced under a regime that has [since] been held unconstitutional[.]"[51]

---

[49] *Kimbrough v. United States*, 552 U.S. 85, 91 (2007).

[50] *United States v. Vigneau*, 473 F. Supp. 3d 31, 38 (D.R.I. 2020).

[51] *United States v. Jones*, -- F. Supp. 3d --, 2020 WL 5359636, at *7 (N.D. Cal. Aug. 27, 2020).

16

A judge in the post-*Booker* era would consider Mr. Hunter's relative youth at the time of the killing, especially in light of modern developments in neurosciences. "While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant."[52] Mr. Hunter's "'relative youth at the time of the sentence' particularly supports compassionate release because his young age is coupled with an extremely long sentence."[53]

A court sentencing Mr. Hunter today would be constrained only by the combined mandatory minimum of 25 years.[54] Having served 283 months, Mr. Hunter has served nearly 28 years when good time is accounted for and has therefore satisfied statutory requirements. Relief is appropriate.

## III.   The § 3553(a) Factors Weigh in Favor of Release.

The 283 months Mr. Hunter has served is sufficient to satisfy the purposes of sentencing.[55] Mr. Hunter was sentenced to life imprisonment to reflect on the

---

[52] *United States v. Lopez*, No. 97-cr-01117, 2020 WL 6298061, at *5 (D. Haw. Oct. 27, 2020) (quotation omitted) (granting compassionate release to man who was 18 at the time of his convictions, which included carrying a gun in relation to a drug trafficking conspiracy and in the course of that crime committing first degree murder).

[53] *Id.* (quoting *McCoy v. United States*, No. 03-cr-197, 2020 WL 2738225, at *5 (E.D. Va. May 26, 2020) (granting compassionate release to a man who was a teenager at time of offense who had served over 17 years of his more than 35-year sentence) and citing *Maumau*, No. 08-cr-00758, 2020 WL 806121, at *5, *7 (granting release in part based on the young age of the defendant who was 20 when arrested and 24 when sentenced).

[54] *See* 21 U.S.C. § 848(e)(1)(A) (20-year minimum); 18 U.S.C. § 924(c) (5-year minimum).

[55] *United States v. Sain*, No. 07-cr-20309, 2020 WL 5906167, at *6 (E.D. Mich. Oct. 6, 2020) ("The overarching § 3553 consideration is that in the end, the Court is to impose a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing.") (citing *Kimbrough*, 552 U.S. at 101 (2007)).

seriousness of his offenses. In his more than two decades in prison, he has matured from a rash young man to a reflective, empathetic middle-aged man.

Mr. Hunter's convictions are serious. Death is always serious. However, other incarcerated people "convicted of both capital and other violent crimes and sentenced to life have been released by district courts in light of the pandemic."[56] And life sentences are not always appropriate when someone is convicted of murder. Indeed, throughout the country, district courts routinely impose non-life sentences for murder. For instance, in 2019, the average murder sentence was 255 months.[57] Although the average murder sentence in 2018 was 291 months, the Sixth Circuit average was 232 months.[58] This suggests a life sentence is not always necessary to reflect the seriousness

---

[56] *See, e.g., United States v. Rios*, No. 94-cr-112, 2020 WL 7246440, at *5 (D. Conn. Dec. 8, 2020) (collecting cases); *id.* at *1, *3 (releasing man serving three life sentences, one of which was for VICAR murder, who had 7 disciplinary infractions and six priors by the time he was sentenced at age 27, even though he "planned this murder, acting not on impulse of on orders from others, but rather with the hard heart of a calculated killer"); *Lopez,* No. 97-cr-01117, 2020 WL 6298061  (granting compassionate release to man who was 18 at the time of his convictions, which included carrying a gun in relation to a drug trafficking conspiracy and in the course of that crime committing first degree murder). *Cf. United States v. Rodriguez*, -- F. Supp. 3d. --, 2020 WL 5810161, at *1, *6, *7 (S.D.N.Y. Sept. 30, 2020) (reducing man's life sentence – imposed for RICO convictions as well as the "brutal torture" and "brutal murder" of a government informant pursuant to § 848(e)(1)(A) – where man was the chief lieutenant of the enterprise, 34 at the time of arrest, and where the murder "not was not 'average' murder" but rather "an act of torture and violence designed to send a dangerous message that cooperation with law enforcement would be brutally punished").

[57] *See* U.S.S.C., *2019 Annual Report and Sourcebook of Federal Sentencing Statistics*, at 64.

[58] U.S.S.C., *Statistical Information Packet, Fiscal Year 2018, Sixth Circuit*, at 11.

of the offense. Mr. Hunter has served more than 283 months (289 if his state custody is counted, *see* note 2, *supra*), which is longer than many courts deem necessary.

The government cannot seriously argue that anything short of a life sentence is insufficient given the sentences of Mr. Hunter's codefendants. Powell, who pled guilty to killing *three* people, was released in 2013.[59] *See* pages 4-5 & n.4, *supra*. And Patton, who ordered several murders including that of Ms. Johnson, never pled to killing anyone.[60] A sentence reduction would address glaring disparities in this case.

The 283 months Mr. Hunter has served is substantial punishment that reflects the seriousness of his offenses and the need for deterrence, particularly in light of the harsh conditions of confinement since COVID began ravaging the BOP. The pandemic has amplified the severity of his sentence, a consideration that speaks to the need "to provide just punishment[.]"[61] Surely "just punishment" does not include a period of incarceration during which a susceptible man is exposed to a life-threatening virus.

---

[59] *Cf. Rios*, No. 94-cr-112, 2020 WL 7246440, at *6 ("While taking one person's life is morally reprehensible, killing three bespeaks a level of depravity that distinguishes Mr. Morales's crimes from those of Mr. Rios."). More recently, the government agreed to a prison term of 20 to 25 years for a man who confessed to the intentional killing of a person in relation to the drug conspiracy. *United States v. Antoine*, No. 19-cr-00140, ECF No. 349 at 9-10 (D. Md.). (ECF No. 349 at 6, 9-10.)

[60] As another court observed, "the danger posed by" leaders of organized criminal enterprises such as Patton "is not that these leaders will personally engage in acts of violence, but that they 'can command others to do so.'" *United States v. Gioeli*, No. 08-cr-240, 2020 WL 2572191, at *5 (E.D.N.Y. May 21, 2020) (quoting *United States v. Gotti*, No. 02-cr-743, 2020 WL 497987, at *9 (S.D.N.Y. Jan. 15, 2020) ("Bosses don't commit violence themselves, they have subordinates do their bidding.").

[61] 18 U.S.C. § 3553(a)(2)(A). *See also United States v. Little*, No. 18-cr-308, 2020 WL 2613034, at *2 (N.D. Ohio May 23, 2020) ("The laborious nature of [incarceration

19

Mr. Hunter's most relevant personal characteristic is COVID vulnerability, which place him at high risk of severe illness or worse.[62] Another relevant consideration is his efforts toward rehabilitation.[63] The Court must consider post-offense developments under § 3553(a), which provide "the most up-to-date picture" of Mr. Hunter and "sheds light on the likelihood that [he] will engage in future criminal conduct."[64]

Mr. Hunter has used his time in custody to work on himself. He has taken advantage of programming and earned his GED despite not having any reason to suspect that he might one day be released. (*See* Ex. 10, Prog. Rev. (SEALED).) He has taken drug education courses, several classes aimed at improving his physical health, a parenting course, GED courses, and, although not reported in his records, Mr. Hunter completed the intensive CODE program, now known as the Challenge Program, at USP Leavenworth in 2001. The BOP describes the Challenge Program as "a cognitive-behavioral, residential treatment program" that provides "treatment to high security inmates" and "focuses on the reduction of antisocial peer associations; promotion of positive relationships; increased self-control and problem solving skills; and development of pro-social behaviors. The program places a special emphasis on

---

during a COVID-19 outbreak] incarceration causes the § 3553(a) factors to favor release before the defendant has served his [] full sentence." *Cf. Rodriguez*, No. 00-cr-761, 2020 WL 5810161, at *3 (describing increased severity of sentence as a factor weighing in favor of a finding of extraordinary and compelling reasons).

[62] *See* 18 U.S.C. § 3553(a)(1); *United States v. Owdish*, No. 18-cr-20423, 2020 WL 4596822, at *4 (E.D. Mich. Aug. 11, 2020).

[63] *See, e.g.*, *Sain*, No. 07-20309, 2020 WL 5906167, at *4-*5.

[64] *Pepper v. United States*, 562 U.S. 476, 492 (2011).

violence prevention." In addition to programming, Mr. Hunter engages in self-study and is an avid consumer of self-help books. He wants to mentor at-risk youth if he is released and he can be an asset to the community in this role. (Ex. 2, Hunter Ltr.) Further, Mr. Hunter works as a Rec Weekend Orderly, which will help him attain his goal of starting a cleaning company. (Ex. 10, Prog. Rev.; Ex. 2, Hunter Ltr.) To the extent he needs additional skills or therapy, supervised release can provide those services.

Mr. Hunter is not a danger to the community.[65] It is true that he has convictions from nearly 25 years ago. (PSR ¶¶ 48-53.) But people with priors are not irredeemable. Indeed, "this country's criminal justice system is premised on the idea that a person can—and hopefully will—change after several years locked in prison."[66] Mr. Hunter acknowledges his past but has worked hard to rise above it and is determined to leave it behind him. At age 51, he is not the same man he once was. His 23-plus years in custody have shed new light on the § 3553(a) analysis as it applies to him, and which was constrained in 2003 by the then-mandatory Guidelines. Today, Mr. Hunter accepts responsibility for his mistakes and fully appreciates, and lives each day with, the

---

[65] 18 U.S.C. § 3553(a)(2)(c).
[66] *Lopez*, No. 97-cr-01117, 2020 WL 6298061, at *5 (quotation omitted).

repercussions of his actions. (*See, e.g.*, Ex. 2, Hunter Ltr.) Mr. Hunter's acceptance of responsibility, contrition, and remorse is best evidenced by his letter to the Court.[67] (*Id.*)

Mr. Hunter is much older, more mature, and wiser than he was at 23 years old. He is nearly 52 years old, making him statistically unlikely to recidivate.[68] Although convicted of a violent crime, "[w]ithin any given age bracket, individuals released after imprisonment for violent crimes recidivate at a lower rate than releasees who served time for any other category of crime."[69]

Mr. Hunter's BOP disciplinary history does not speak to his current dangerousness. He has been disciplined ten times, but his disciplinary history has had a positive trajectory. Only a few infractions were "violent" and they can only be described as such if one ignores the inherent dangers at USPs that require those incarcerated there to be prepared to defend themselves. (*See* Ex. 11, Discipline (SEALED).) They also occurred more than 14 years ago.

First, in 2002, another inmate at USP Pollack was about to attack Mr. Hunter with a shank. Aware his life was on the line, he put a lock into a sock. Mr. Hunter did

---

[67] *See United States v. Brown*, No. 00-cr-0100, 2020 WL 7425328, at *17 (D. Md. Dec. 17, 2020) (noting that inmate incarcerated for life "now accepts responsibility for his misconduct" and quoting inmate's letter in decision granting his compassionate release).

[68] *See, e.g.*, *United States v. Tucker*, No. 3-CR-246-02, 2019 WL 324423, *2 (S.D. Iowa Jan. 23, 2019) (granting relief under the 1SA and noting that "defendant turned fifty last year, an age at which the Sentencing Commission has found that recidivism rate begins to decline substantially"); U.S.S.C., *The Effects of Aging on Recidivism Among Federal Offenders* at 11 ("[A]ge is . . . a strong factor influencing the likelihood of committing crime[.]").

[69] J.J. Prescott, Benjamin Pyle, Sonja B. Starr, *Understanding Violent-Crime Recidivism*, 95 Notre Dame L. Rev. 1643, 1688 (2020).

not use it but displayed it as his assailant approached him. Then in 2003, while incarcerated at USP Beaumont, Mr. Hunter admitted to possessing a shank. He was not accused of threatening anyone with it, of brandishing it, or of using it.

In 2006, Mr. Hunter received two shots at USP Terre Haute. In one, he was accused of possessing a shank. Mr. Hunter had just moved into a new cell and guards found a shank screwed inside of a light fixture. Mr. Hunter did not know it was there and could not access it. In another, Mr. Hunter and his friend got into a scuffle. Neither was injured. They were placed in a cell together and did not fight again.

Frankly, Mr. Hunter's relatively short disciplinary history during his time in USPs is remarkable given that he spent so much time at prisons where conflict and violence are commonplace. USP Pollock has been described, at the time Mr. Hunter was there, as "a bit like 1960s Vietnam" because it "averaged dozens of stabbings a month."[70] And USP Beaumont has been dubbed "the thunder dome," a "moniker borrowed from the Mad Max fantasy flicks of the 1980s, [that] refers to the place where two go in and only one leaves alive."[71]

For nearly 11 years, Mr. Hunter was misconduct free. He then received three less serious misconducts upon transferring to Pekin in 2018. In the first, a woman in the

---

[70] John Broman, *What I Learned from 13 Years of Witnessing Violence in Federal Prisons*, Vice (Sep. 25, 2015); *see also* Brandon Sample, *Violence on the Rise in BOP Facilities*, Prison Legal News (Aug. 15, 2009).

[71] Leah Caldwell, *USP Beaumont, Texas: Murder and Mayhem in the Thunder Dome*, Prison Legal News (Sept. 15, 2005).

cafeteria accused Mr. Hunter of gracing her hand when he picked up a cup. Later, he was cited for refusing to obey an order. A rookie guard asked Mr. Hunter to open his ice cream bar. When Mr. Hunter instead showed him the commissary receipt, the guard called him into an office and said, "When I tell you to do something, you do it." Finally, in August 2019, Mr. Hunter was ticketed for "being in an unauthorized area." During rec time, a guard summoned "Hunter from Illinois 2" over a speaker. Because there are many "Hunters" at Pekin and Mr. Hunter is in Iowa 1, he did not think he was being called. Later, a lieutenant acknowledged a different unit was referenced in the callout but stated that Mr. Hunter should have checked in anyway. It is worth adding here that racially-disparate punishment exists in prisons. "African Americans are subject to higher rates of punishment and are provided with inferior health care while incarcerated."[72]

While Mr. Hunter's disciplinary record is not spotless, "[n]othing in [it] raises any concern about him having a continued propensity for violence."[73] And, in any event, the BOP sanctioned Mr. Hunter for his misconduct, all of which is either too remote or insufficiently severe to warrant denying his motion.[74]

---

[72] Jeremiah Wade-Olson, PhD, *Punishing the Vulnerable: Discrimination in American Prisons* at 72 (Praeger: 2019) (citations omitted). *See also id.* at 75 ("Rather than a difference in offending, there is evidence that patterns of rule enforcement were systematically biased against African American inmates.").

[73] *United States v. Clausen*, No. 00-cr-291, 2020 WL 4260795, at *8 (E.D. Pa. July 24, 2020).

[74] *See, e.g.*, *United States v. Marks*, 455 F. Supp. 3d 17, 27 (2020) (finding defendant with stacked § 924(c) convictions did not pose a danger despite infractions for fighting in 2008, 2009, and 2010, and being found guilty of "bribing a staff member" in 2013); *United States v. James*, 03-cr-21013, ECF Nos. 164, 174 (S.D. Fla. Oct. 7, 2020) (granting

Mr. Hunter's placement in medium security facilities also undercuts a finding that the public needs to be protected from him. "The BOP generally gives defendants with life sentences a 'high' security classification unless an administrator waives certain public safety factors."[75] The BOP first transferred Mr. Hunter to a medium-security facility in 2014. This suggests the BOP believes Mr. Hunter has made progress.

Mr. Hunter's institutional record is a testament to the remorseful and peaceful man he has become and is a strong predictor of how he will perform on supervised release if his sentence is reduced. Mr. Hunter's conduct and efforts to prepare for reentry show that his release will not endanger the public.

Finally, Mr. Hunter has a solid release plan. He enjoys the love and support of family and friends who have offered to help him succeed if he is released early. (*See* Ex. 12, Support Ltrs.) If released, Mr. Hunter plans to reside in a condominium near downtown Detroit that his friend, Mr. Lawrence Johnson, owns and has offered to Mr. Hunter. Mr. Johnson owns several multifamily unit buildings in the city and has also offered to employ Mr. Hunter to clean and maintain the properties. Following his release, Mr. Hunter will be supervised by Probation for as long as the Court deems appropriate, which will curtail his liberty interests, as he will face harsh consequences if

---

release to a defendant with five disciplinary infractions, including testing positive for THC and twice possessing a "hazardous tool"); *United States v. Clemons*, No. 08-cr-102, 2020 U.S. Dist. LEXIS 12879, at *10 (E.D. Tenn. Jan. 27, 2020) (reducing a 360-month sentence of a defendant with 17 prior convictions who had been sanctioned by the BOP three times in the six months before his motion was filed).

[75] *United States v. Ledezma-Rodriguez*, 472 F. Supp. 3d 498, 508 & n.6 (S.D. Iowa 2020).

25

he violates any release condition. Supervised release will also "assist him in his 'transition to community life' and 'fulfill[] rehabilitative ends.'"[76]

## CONCLUSION

The Court has wide discretion to craft a sentence that satisfies all the 18 U.S.C. § 3553(a) factors. He requests an order reducing his sentence to time served and imposing a term of supervised release.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER**

Dated: January 6, 2021

s/Laura Danielle Mazor
Attorney for Ronald Hunter
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5542
E-mail: laura_mazor@fd.org

---

[76] *Jones*, No. 94-cr-20079, 2020 WL 5359636, at *11 (quoting *United States v. Johnson*, 529 U.S. 53, 59 (2000)).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                    Cr. No. 92-81058

v.                             Honorable Matthew F. Leitman

D-21 RONALD HUNTER,

      Defendant.

_____/

**CERTIFICATE OF SERVICE**

     Counsel certifies that on the below date, the foregoing paper was filed with the clerk of the Court using the ECF system, which will send notification to opposing counsel.

                          Respectfully submitted,

                          **FEDERAL COMMUNITY DEFENDER**

Dated: January 6, 2021        s/Laura Danielle Mazor
                          Attorney for Ronald Hunter
                          613 Abbott Street, Suite 500
                          Detroit, Michigan 48226
                          (313) 967-5542
                          E-mail:  laura_mazor@fd.org